UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUPERIOR INDUSTRIES
INTERNATIONAL, INC.

      Plaintiff,

v.

JORGE CABALLERO ALVAREZ

      Defendant.

_____/

Case No. 21-cv-12190
Hon.

Timothy J. Lowe (P68669)
Mark W. Steiner (P78817)
McDonald Hopkins PLC
39533 Woodward Avenue, Suite 318
Bloomfield Hills, MI  48304
(248) 220-1352
tlowe@mcdonaldhopkins.com
msteiner@mcdonaldhopkins.com
*Attorneys for Plaintiff*

_____/

## COMPLAINT

Plaintiff, Superior Industries International, Inc. ("Superior"), by and through its counsel, McDonald Hopkins PLC, for its Complaint against Defendant, Jorge Caballero Alvarez ("Defendant"), alleges as follows:

## INTRODUCTION

1.     Defendant is a former executive of Superior, who held the title of Vice President Operations at the time of his voluntary resignation on May 9, 2021.

Defendant was entrusted with Superior's high-value information and was responsible for all manufacturing operations and advanced manufacturing engineering in North America. Defendant specifically had access to Superior's product portfolio, product specifications, product development programs and strategies, customer contacts and engagement strategies, manufacturing processes, proprietary production technologies, future R&D initiatives, workforce files and payroll data, budgeting and sensitive profitability data.

2.     Defendant was subject to multiple binding contracts with Superior that included both Non-Compete and Non-Solicitations Agreements. Defendant's contractual obligations to Superior prohibited Defendant from working with direct competitors of Superior, or otherwise selling or providing any products or services which are the same or similar to those offered by Superior for a period of twelve (12) months following his termination. Defendant was further contractually prohibited from soliciting, directly or indirectly, Superior's employees, customers, licensees, vendors, or other business relationships.

3.     On May 9, 2021, Defendant voluntarily terminated his employment with Superior. Defendant specifically informed Superior that he was not leaving Superior to work for a competitor (though was staying in the automotive industry).

4.     Notwithstanding Defendant's representations, Superior has learned that Defendant accepted employment with one of Superior's direct competitors,

CITIC Dicastal Co., Ltd. ("Dicastal") (or one of its affiliates), which conducts the same or similar business as Superior as the head of its Mexican operations

5.     Defendant has chosen to blatantly and knowingly violate his restrictive covenants by working for Dicastal.  For these and other reasons, as described more fully herein, Superior brings this Complaint and seeks injunctive and other relief.

## PARTIES, JURISDICTION, AND VENUE

6.     Superior is a Delaware corporation with its principal place of business located in Oakland County, Michigan.

7.     Upon information and belief, Defendant is a resident of Chihuahua, Mexico.

8.     Subject matter jurisdiction is proper in this Court because the action is between a citizen of a State and a citizen of a foreign state who is not lawfully admitted for permanent residence in the same state as Superior, and the amount in controversy exceeds $75,000.00, exclusive of interest, costs or attorneys' fees. Therefore, this Court has original jurisdiction over the matter pursuant to 28 U.S.C. §1332.

9.     This Court has personal jurisdiction over the Defendant because the Defendant regularly traveled to Michigan for his employment with Superior and

had regular and consistent communication and collaboration with Superior's executives located in Southfield, Michigan

10.     Venue is proper because the parties had substantial dealings in the Eastern District of Michigan.

## COMMON FACTUAL ALLEGATIONS

**A.  Background Related to the Entities Involved in this Lawsuit.**

11.     Superior is one of the world's largest light vehicle aluminum wheel suppliers. Superior operates nine manufacturing facilities and employs approximately 8,000 people in North America and Europe.

12.     Superior manufactures and supplies several types of wheels, such as cast aluminum wheels, flow formed wheels, and forged wheels.

13.     Superior supplies its products to several Original Equipment Manufacturers ("OEM") of vehicles, including but not limited to: Audi, BMW, Daimler/Mercedes-Benz, Ford, General Motors, Honda, Jaguar, Hyundai, Land Rover, Mazda, Mini, Nissan, Toyota, Tesla, Volvo, and Volkswagen.

14.     Similarly, Dicastal manufactures aluminum alloy wheels for the automotive industry. Dicastal advertises that it is the "largest supplier for aluminum wheel and chassis components in the world."

15.     Dicastal further advertises that it supplies to several of the same OEMs as Superior, including: Mercedes Benz, BMW, Audi, Volkswagen, General Motors, Ford, Toyota, Honda, Mazda, and Hyundai.

16.     Superior has achieved success in the highly competitive automotive industry by providing high quality products and maintaining a commitment to developing and advancing new technologies.  Superior has built its reputation for uncompromising professional service to its customers and expends considerable resources to select, hire, and train employees, particularly its executives and leaders.

17.     Superior keenly values its proprietary business information and maintains it with secrecy.  Information related to Superior's product development, pricing, margin strategies, engineering and design specifications, trade secrets, customers, potential customers, suppliers, employees, and/or other financial, strategic, and technical information, is protected and safeguarded so it is not known to Superior's competitors and is lawfully not ascertainable by them ("Superior Information").  The Superior Information derives independent economic value from not being generally known to the public, and disclosure of the information would provide economic value to others.

18.     To ensure Superior can efficiently and effectively provide its products and services to customers, it discloses a substantial amount of its confidential, proprietary, and trade secret information to certain of its select employees.

19.     As such, Superior takes reasonable steps to protect its confidential information, proprietary information, and trade secret information.

**B.  Defendant's Employment and Agreements with Superior.**

i.  **Defendant's Employment with Superior.**

20.     On April 13, 2000, Superior hired Defendant as Senior Industrial Engineer as part of Superior's North America division.

21.     In Defendant's role as Vice President Operations, he was responsible for all manufacturing operations, plant engineering, customer service, budget and profitability for Superior's North American business.  Defendant regularly worked with Superior's Vice Presidents of Finance, Sales, Purchasing, and Human Resources, all of whom reported directly or indirectly to Superior's President of North American Operations.

22.     Defendant was a high-level executive who had the ability to directly influence Superior's profitability and performance.

23.     Defendant worked for Superior in both the United States and Mexico. However, he was also the executive lead on European technology and information

transfer from Europe to North America. In this role, he had complete access to Superior's European technology, operations, plant layouts, equipment, and more.

24.     Given Defendant's position in Superior, Superior provided Defendant with access to the Superior Information.

ii.  **The Restricted Award Agreement.**

25.     Through Defendant's employment with Superior, Defendant periodically executed various agreements with Superior for performance and other monetary awards.

26.     On or about March 3, 2020, Defendant agreed to a long term cash incentive plan by executing a Restricted Award Agreement with Superior (the "Restricted Award Agreement").  **Exhibit A**, Restricted Award Agreement.

27.     The Restricted Award Agreement essentially was a vesting plan pursuant to which Superior would pay Defendant $38,904 USD annually over the course of three years (the "Restricted Award").  The first vesting date was on March 3, 2021, and the final vesting date was on March 3, 2023.  On each vesting date, Defendant would receive the vested funds. Defendant was paid the first installment on March 18, 2021.

28.     By accepting the Restricted Award, Defendant accepted various additional terms, including a covenant not to compete or solicit, which Defendant

agreed was a condition precedent to accepting the award.  Restricted Award

Agreement, ¶ 5.

29.    Specifically, the restrictive covenant provisions included:

2.    **Covenants Not to Compete or Solicit.**

(f)  <u>Non-Competition</u>.  During Participant's Continuous Service and ending upon the later of twelve (12) full months after (i) the effective date of the termination of such Continuous Service or (ii) the last date on which Participant receives compensation from Company related to Participant's employment or service relationship with the Company or any Affiliate or any termination there of ("Restricted Period"), Participant shall not (i) engage in, sell or provide any products or services which are the same or similar to or otherwise competitive with the products and services sold or provided by the Company or any Affiliate in the Restricted Area (as defined in <u>Exhibit B</u>); and/or (ii) own, acquire, or control any interest, financial or otherwise, in a third party or business engaged in selling or provided the same, similar or otherwise competitive services or products which the Company or any Affiliate is selling or providing, other than ownership of one percent (1%) or less of the equity of a publicly-traded company.

(g)  <u>Non-Solicitation</u>.  During the Restricted Period, Participant shall not (i) directly, or indirectly through another person, hire any employee of the Company or any of its Affiliates or induce any employee of the Company or any of its Affiliates to leave the employ of the Company or any of its Affiliates, and/or (ii) directly, or indirectly through another Person, induce any customer, supplier, licensee, vendor or other business relation of the Company or any of its Affiliates to cease doing business with the Company or any of its Affiliates, or in any way intentionally interfere with the relationship between any such customer, supplier, licensee, vendor or business relation, and the Company or any of its Affiliates.

**Exhibit A**, Restricted Award Agreement, Exhibit A, ¶ 2.

30.    Defendant additionally agreed to keep confidential the Superior Information.  **Exhibit A**, Restricted Award Agreement, Exhibit A, ¶ 1.

31.    Defendant affirmed that "[i]f the Participant breaches any of the restrictive covenants contained in <u>Exhibit A</u>, then the Participant shall forfeit any cash payment contemplated under the Notice and Agreement, whether Vested or Unvested and whether or not distributed to the Participant."  **Exhibit A**, Restricted Award Agreement, ¶ 3.

32.    The Restricted Award Agreement additionally makes clear that its restrictive covenant conditions "shall apply in addition to (and shall not be limited by the provisions of) any other non-competition, non-pooling, non-solicitation, confidentiality, non-disparagement or similar covenants or conditions to which the Participant is a party with" Superior. **Exhibit A**, Restricted Award Agreement, ¶ 5.

33.    Defendant also agreed, through the Restricted Award Agreement, that the non-competition and non-solicitation covenants were supported by adequate consideration, were reasonable, and "does not believe would prevent him or her from otherwise earning a living."  **Exhibit A**, Restricted Award Agreement, Exhibit A, ¶ 4(k).

iii.  **The Performance Award Agreement.**

34.    On the same day Defendant agreed to the Restricted Award Agreement, March 3, 2020, Defendant executed an entirely separate Performance

Award Agreement with Superior (the "Performance Award Agreement").  **Exhibit B**, Performance Award Agreement.

35.    The Performance Award Agreement set various benchmarks for Superior's performance, where if Superior met the various performance goals set forth therein, Defendant would be entitled to a bonus sum of $38,904.00 (the "Performance Award").

36.    The Performance Award Agreement was for a term between January 1, 2020 through December 31, 2022.

37.    In consideration for the Performance Award, Defendant again agreed to various terms and conditions, **which are identical to those in the Restricted Award Agreement.**

38.    Accordingly, Defendant similarly agreed to be bound by the same restrictive covenant provisions, agreed that they were reasonable, that there was adequate consideration, and that signing them would not unduly restrict his employment, should he terminate his employment.  *See* Performance Award Agreement.

iv. **The Retention Bonus Agreement.**

39.    On September 8, 2020, several months after signing the Restricted Award Agreement and the Performance Award Agreement, Superior offered Defendant another retention bonus award plan due to the fact Superior

"consider[ed] [Defendant's] continued service and dedication to [Superior] essential to our business" (the "Retention Bonus Agreement"). **Exhibit C**, Retention Bonus Agreement.

40.    The Retention Bonus Agreement offered Defendant 1,956,618 MXN (approximately $100,000 USD), vesting on August 31, 2022, should Defendant remain employed with Superior.

41.    Defendant accepted the Retention Bonus Agreement subject to additional terms and conditions (similar to the Restricted Award Agreement and the Performance Award Agreement).

42.    Among these provisions were covenants not to compete or solicit:

2.    **Covenants Not to Compete or Solicit.**

<u>Non-Competition</u>.  During Participant's Continuous Service (as defined below) and ending twelve (12) full months after the later of (i) the effective date of the termination of such Continuous and (ii) the last date on which Participant receives compensation from Company or any of its affiliates related to Participants' employment or service relationship with the Company or any of its affiliates or any termination there of (the "Exhibit A Restricted Period"), Participant shall not, and will cause his/her affiliates not to, directly or indirectly, through or in association with any third party, in the applicable geographical area described in Exhibit B (the "Restricted Area"), (i) engage in, sell or provide any products or services which are the same or similar to or otherwise competitive with the products and services sold or provided by the Company or any Affiliate; and/or (ii) own, acquire, or control any interest, financial or otherwise, in a third party or business engaged in selling or providing the same, similar or otherwise competitive services or products which the Company or any affiliate is selling or providing, other than ownership of one percent (1%) or less of the equity of a publicly-traded company.

"Continuous Service" means that a Participant's employment or service relationship with the Company or any of its affiliates is not interrupted or terminate. Continuous Service shall not be considered interrupted in the following cases: (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company and any Subsidiary or successor.  A leave of absence approved by the Company shall include sick leave, military leave or any other personal leave approved by an authorized representative of the Company. For purposes of any award that is subject to Section 409A of the Internal Revenue Code, the determination of a leave of absence must comply with the requirements of a "bona fide leave of absence: as provided in the Treasury Regulations Section 1.409A-1(h).

Non-Solicitation.  During the Exhibit A Restricted Period, Participant shall not (i) directly, or indirectly through another person, hire any employee of the Company or any of its affiliates or induce any employee of the Company or any of its affiliates to leave the employ of the Company7 or any of its affiliates, and/or (ii) directly, or indirectly through another person induce any customer, supplier, licensee, vendor or other business relation of the Company or any of its affiliates to cease doing business with the Company or any of its affiliates, or in any way intentionally interfere with the relationship between any such customer, supplier, licensee, vendor or business relation, on the one hand, and the Company or any of its affiliates, on the other hand.

**Exhibit C**, Retention Award Agreement, Exhibit A.

43.    As in the Restricted Award Agreement and the Performance Award Agreement Defendant represented that the terms were reasonable, that there was adequate consideration, and that the restrictive covenants would not unduly restrict his employment, should he terminate his employment.

44.   Pursuant to the Restricted Award Agreement, Performance Award Agreement, and Retention Award Agreement (the "Agreements"), Superior generously compensated Defendant and entrusted Defendant with Superior Information.

45.   Superior took reasonable steps to maintain the confidentiality of the Superior Information. Superior also took reasonable steps to protect its customer relationships, reputation, and customer good will.  By way of example, Superior required Defendant to sign the Agreements.

### C.  Defendant Terminates His Employment and Accepts a Position with a Competitor of Superior.

46.   On or around April 20, 2021, Defendant had a conversation with Michael Dorah (President of Superior), his supervisor at Superior, and Miguel Vega (Vice President of Human Resources of Superior).

47.   Defendant informed Mr. Dorah and Mr. Vega that he was leaving Superior on May 9, 2021, but that he would not be working for one of Superior's competitors.

48.   Defendant worked the rest of the week and then took vacation before ending his employment on May 9, 2021.  Defendant provided Superior little notice or time to transition Defendant's position.

49.   Superior later became aware the Defendant began to work for Dicastal.

50.    Dicastal, as described above, is a competitor of Superior that manufactures aluminum wheels.

51.    In fact, Superior's Annual Report (Form 10-K) from 2020 Fiscal Year specifically identifies Dicastal as a competitor and Superior has long considered Dicastal as a primary competitor.

52.    Dicastal holds similar market share as Superior in North America and is a direct competitor of Superior for all major OEM customers. Dicastal and Superior are routinely among the top 3 competitors bidding for new programs.

53.    Defendant's deep knowledge of Superior's product and technology portfolio as well as Superior's cost and pricing strategies will provide a competitive edge to Dicastal.

54.    Superior has not waived the restrictive covenant provisions contained in the Agreements.

55.    On August 16, 2021, Superior sent a cease and desist letter to Defendant, informing him that his employment with Dicastal was a direct violation of the restrictive covenant provisions, namely the non-compete covenant, contained in the Agreements.  **Exhibits D**.

56.    Superior stated that any continued violation of the Agreements would result in legal action.

57.    Defendant failed to respond to Superior's August 16, 2021 letter.

58.     Superior additionally sent a letter to Dicastal, informing Dicastal that their employment of Defendant was in violation of Defendant's non-compete obligations pursuant to the Agreements.  **Exhibit E**.

59.     Dicastal, like Defendant, failed to respond to Superior's letter.

60.     After Superior sent letters to Defendant and Dicastal reminding them of Defendant's obligation, Defendant solicited a Superior employee in Mexico to leave Superior and take employment at Dicastal, in breach of his Agreements.

61.     Defendant's misconduct unfairly and illegally harms Superior's business by way of the potential loss of Superior customers/potential customers, negative financial impact to Superior, the loss of Superior's competitive edge, goodwill, and reputation, and the disclosure of the Superior Information.

62.     The impact of Defendant's breach of his restrictive covenant agreements is irreparable.

63.     Superior lacks an adequate remedy at law to address the substantial and irreparable harm that it is suffering and will suffer as a result of Defendant's breach of his Agreements.

64.     Due to Defendant's likely disclosure of the Superior Information, and the consequent harm to Superior competitive edge, customer goodwill, and reputation, Superior is entitled to temporary, preliminary, and permanent injunctive relief as well as damages, including, but not limited to, costs and attorneys' fees.

## COUNT I – BREACH OF CONTRACT

65.     Superior realleges and incorporates the foregoing allegations as if fully restated herein.

66.     Defendant voluntarily entered into the Agreements with Superior.

67.     The Agreements are valid, enforceable, and supported by adequate, legal consideration.

68.     The Agreements contain non-competition and non-solicitation provisions.

69.     The non-competition and non-solicitation provisions in the Agreements are reasonable and appropriate. These provisions are narrowly-tailored to preclude Defendant only from working for those companies that sell the same or similar products or services that compete with Superior's products.

70.     Superior engages in business in only a relatively small, and specifically defined, tier one supplier segment of the automotive wheel market.

71.     The non-competition and non-solicitation provisions in the Agreements do not prevent Defendant from working or from securing a new job, a fact admitted by Defendant when he signed the Agreements. He may work for any countless number of companies, in the automotive industry, electronics industry and in other industries, and still be in compliance with the Agreements.

Nonetheless, Defendant has chosen to voluntarily leave his job at Superior to work for one of the handful of companies that directly compete with Superior.

72. Superior at all times complied with the terms of the Agreements and has fully performed as required under the Agreements.

73. Dicastal directly competes with Superior.

74. Dicastal sells products that "are the same or similar to or otherwise competitive with the products and services sold or provided by" Superior.

75. Defendant is employed with Dicastal and is in material breach of the Agreements.

76. Defendant has breached, and will inevitably continue to breach, the Agreements in at least all of the ways described in this Complaint, including, but not limited to, violating his contractual non-competition and non-solicitation commitments by working for a direct competitor.

77. As a result of Defendant's breaches, Superior has suffered damages and irreparable injury, and Superior will continue to suffer irreparable injury for which there is no adequate remedy at law.

78. Superior is entitled to damages, costs, and attorneys' fees, and to preliminary and permanent injunctive relief against further breaches of the Agreements.

WHEREFORE, Plaintiff Superior respectfully requests that this Court grant the following Relief:

(1)    Issue a Preliminary and Permanent Injunction restraining and enjoining Defendant from:

    a)    Directly or indirectly working or performing any services for any business that sells "the same or similar to or otherwise competitive with the products and services sold or provided by" Superior (as defined in the Agreements), and specifically Dicastal, until twelve (12) months from the date of this Court's order;

    b)    Directly or indirectly soliciting any Superior employees or customers who are doing business with Superior or who did business with Superior during the six months before Defendant's resignation, until twelve (12) months from the date of this Court's order;

    c)    Violating the terms and conditions of the Agreements.

(2)    That after the trial of this action, Permanent Injunctions be issued to the same effect as the Preliminary Injunctions requested above; and

(3)    Grant Superior relief in the form of money damages, including exemplary damages, costs, and disbursements of this action, including attorneys' fees, and such other relief as this Court may deem just and appropriate.

Respectfully submitted,

McDONALD HOPKINS PLC

By:       /s/Timothy Lowe
        Timothy J. Lowe (P68669)
        Mark W. Steiner (P78817)
        39533 Woodward Avenue, Suite 318
        Bloomfield Hills, MI 48304
        (248) 646-5070
        *Attorneys for Plaintiff*

Dated: September 17, 2021

# VERIFICATION OF COMPLAINT

I, Kevin Burke, Senior Vice President and Chief Human Resources Officer for Superior Industries International, Inc. ("Superior"), having first been duly sworn, deposes and states that I have read the foregoing Verified Complaint and verify that the facts stated therein as they relate to Superior are true and accurate, based on my knowledge, belief, and information, including information from Superior's records of and/or information provided to me by employees, agents and representatives of Superior.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___9/17/21___

_Kevin M. Burke_
Kevin M. Burke
Senior Vice President and Chief Human Resources Officer
Superior Industries International, Inc.